UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

ELIZABETH WOOD,

           Plaintiff,

     v.

MYPILLOW, INC.,

           Defendant.

Case No.  26-cv-00110-HSG

**ORDER DENYING MOTION TO COMPEL ARBITRATION**

Re: Dkt. No. 16

Pending before the Court is Defendant MyPillow, Inc.'s ("MyPillow") motion to compel arbitration and stay the case.  Dkt. No. 16 ("Mot.").  The Court finds this matter appropriate for disposition without oral argument and the matter is deemed submitted.  *See* Civil L.R. 7-1(b).  The Court **DENIES** the motion.

## I.   BACKGROUND

On October 25, 2024, Plaintiff Elizabeth Wood purchased two pillows using MyPillow's website.  Dkt. No. 1 ("Compl.") ¶ 47.  Plaintiff alleges that MyPillow's purported discount on these pillows was "deceptive and misleading," and that MyPillow engaged in unlawful "'drip pricing' by charging a mandatory 'Shipping Protection' fee at checkout which [was] undisclosed in Defendant's initial advertising of products."  *Id.* ¶¶ 4, 6.  Based on these allegations, Plaintiff filed this putative class action, bringing claims for fraud, unjust enrichment, and violations of California's consumer protection laws.  *Id.* ¶¶ 63–123.  MyPillow moves to compel arbitration based on an arbitration agreement it claims covers Plaintiff's claims.

### A.   MyPillow Customer Checkout Experience and Arbitration Agreement

When a customer makes a purchase through Defendant's website, she is taken through a checkout screen and presented with a hyperlink to MyPillow's "TERMS AND CONDITIONS"

page.  Dkt. No. 16-2 ("Lindell Decl.") ¶¶ 5–7; Dkt. No. 25 ("Reply") at 2.  Above the "Place Order" button is a checkbox next to the words "TERMS AND CONDITIONS."  Lindell Decl. ¶ 7, Ex. C, at 19–20.[1]  Defendant submitted a screenshot of its online checkout screen, displayed below:




Lindell Decl., Ex. C, at 19–20.

A user who clicks the text "TERMS AND CONDITIONS" is brought to the website's Terms and Conditions page through a hyperlink.  Lindell Decl. ¶ 5.  These terms require arbitration of "any claim, dispute, or controversy . . . arising out of, relating to, or connected in any way with [Defendant's] site [or] the purchase of products from My Pillow."  *Id.* ¶ 4, Ex. B, at 12.  The terms also bar a user from initiating or joining a class action against MyPillow for any dispute "arising out of or connected with" the user's interactions with the site.  *Id.* at 13.

---

[1] Unless otherwise noted, all page numbers referenced herein are to the ECF page number at the top of the page.

United States District Court
Northern District of California

United States District Court
Northern District of California

As shown below, Defendant's website does not allow users to place their order without checking the box next to the words "TERMS AND CONDITIONS."



Lindell Decl. ¶ 7, Ex. C, at 20.

## II.    LEGAL STANDARD

The Federal Arbitration Act ("FAA"), 9 U.S.C. § 1 *et seq.*, establishes that a written arbitration agreement is "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."  9 U.S.C. § 2; *see also Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983) (noting federal policy favoring arbitration). The FAA allows that a party "aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition any United States district court . . . for an order directing that . . . arbitration proceed in the manner provided for in such agreement." 9 U.S.C. § 4.

When a party moves to compel arbitration, the court must determine (1) "whether a valid arbitration agreement exists" and (2) "whether the agreement encompasses the dispute at issue." *Lifescan, Inc. v. Premier Diabetic Servs., Inc.*, 363 F.3d 1010, 1012 (9th Cir. 2004).  The agreement may also delegate gateway issues to an arbitrator, in which case the court's role is

3

limited to determining whether there is clear and unmistakable evidence that the parties agreed to arbitrate arbitrability. *See Brennan v. Opus Bank*, 796 F.3d 1125, 1130 (9th Cir. 2015). In either instance, "before referring a dispute to an arbitrator, the court determines whether a valid arbitration agreement exists." *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 586 U.S. 63, 69 (2019) (citing 9 U.S.C. § 2).

## III.  DISCUSSION

### A.  Formation of the Arbitration Agreement

The threshold issue is whether the parties formed an agreement to arbitrate. *Lifescan*, 363 F.3d at 1012. Plaintiff does not dispute that she checked the box next to "TERMS AND CONDITIONS." *See generally* Dkt. No. 24 ("Opp."). But she argues that in doing so, she did not "enter an agreement to arbitrate her claims." Opp. at 14. As the party seeking to compel arbitration, Defendant bears the burden of proving the existence of the agreement by a preponderance of the evidence. *See Norcia v. Samsung Telecomms. Am., LLC*, 845 F.3d 1279, 1283 (9th Cir. 2017).

#### i.    Choice of Law

In determining whether an agreement was formed, the Court applies "general state-law principles of contract interpretation," without a presumption in favor of arbitrability. *See Goldman, Sachs & Co. v. City of Reno*, 747 F.3d 733, 742 (9th Cir. 2014) (quotations omitted). Defendant argues that the Court should apply either California or Minnesota law in assessing the arbitration agreement at issue. Mot. at 8–13. In her opposition, Plaintiff asks the Court to apply California law, *see* Opp. at 7, and Defendant does not address the issue in its reply, *see generally* Reply.

Here, the Terms and Conditions contain a Minnesota choice-of-law provision. *See* Lindell Decl., Ex. B. However, because Plaintiff challenges whether the Terms and Conditions are enforceable against her at all, the Court applies California's choice-of-law rules. *See Mazza v. Am. Honda Motor Co., Inc.*, 666 F.3d 581, 589 (9th Cir. 2012) ("A federal court sitting in diversity must look to the forum state's choice of law rules to determine the controlling substantive law.") (quotations omitted); *see also* Compl. ¶ 12 (alleging diversity exists for

United States District Court
Northern District of California

United States District Court
Northern District of California

purposes of CAFA jurisdiction).  In California, "[g]enerally speaking the forum will apply its own rule of decision unless a party litigant timely invokes the law of a foreign state."  *See Wash. Mut. Bank v. Super. Ct.*, 24 Cal. 4th 906, 919 (Cal. 2001) (quotations omitted).  Even if Minnesota law applied to this dispute, however, the outcome would not be materially different.  *See Godun v. JustAnswer LLC*, 135 F.4th 699, 708 (9th Cir. 2025) (collecting cases) ("[W]e have consistently stated that no differences exist in the law of the different states as to internet contract formation."); *see also Dawson v. Target Corp.*, No. 3:24-cv-08167-AMO, 2025 WL 1651940, at *1 (N.D. Cal. Jun. 11, 2025) (holding that, with respect to the existence of online arbitration agreements, "the outcome would be the same under Minnesota law" and California law).  The Court therefore applies California law in evaluating whether the parties formed an arbitration agreement.

### ii.  The Parties Did Not Form an Agreement to Arbitrate

A binding online agreement may exist where the user has "actual knowledge of the agreement" or proper "inquiry notice" of the agreement's terms.  *Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849, 856 (9th Cir. 2022).  So long as "a website offers contractual terms to those who use the site, and a user engages in conduct that manifests her acceptance of those terms, an enforceable agreement can be formed."  *Id.*  However, the "conduct of a party is not effective as a manifestation of assent unless he intends to engage in the conduct and knows or has reason to know that the other party may infer from his conduct that he assents."  *Id.* at 855 (quotations omitted).

### a.  The Parties Did Not Form a Valid Clickwrap Agreement

Defendant first argues that its arbitration agreement is a valid clickwrap agreement.  Mot. at 7–8.  The Court disagrees.

In addressing the increasingly complex world of online contract formation, courts have developed several categories of online agreements.  A browsewrap agreement, for instance, is "one in which an internet user accepts a website's terms of use merely by browsing the site."  *Keebaugh v. Warner Bros. Ent.*, 100 F.4th 1005, 1014 (9th Cir. 2024) (citation omitted).  "Courts have consistently held this type of agreement to be unenforceable, as individuals do not have inquiry notice."  *Id.*  Other kinds of online agreements, such as "clickwraps," provide users with

more direct notice of the terms of the agreement. A "clickwrap" agreement is one in which "users are required to click on an 'I agree' box after being presented with a list of terms and conditions of use." *Nguyen v. Barnes & Noble, Inc.*, 763 F.3d 1171, 1175–76 (9th Cir. 2014); *see also Sellers v. JustAnswer LLC*, 73 Cal. App. 5th 444, 463 (2021) ("A 'clickwrap' agreement is one in which an internet user accepts a website's terms of use by clicking an 'I agree' or 'I accept' button." (citation omitted and emphasis removed)). Courts routinely find clickwrap agreements enforceable. *See Berman*, 30 F.4th at 856.

Defendant's checkout screen does not constitute a clickwrap agreement, because the screen does not contain any explicit "I agree" language. Instead, Defendant's checkout screen presents users with a checkbox and the words "TERMS AND CONDITIONS" alongside it. *See* Lindell Decl. ¶ 7, Ex. C, at 19–20. Defendant argues that a "reasonably prudent internet user knows or should know that by clicking a box he or she is agreeing to those terms and conditions." Mot. at 12. But the Ninth Circuit's definition of a clickwrap agreement does not place the burden on the user to figure out what she is agreeing to; instead, it requires websites to state it "explicitly," *see Berman*, 30 F.4th at 856. Defendant's checkout screen simply does not match any recognized examples of clickwrap agreements, all of which have included explicit "I agree" language. *See, e.g.*, *Ortiz v. Univ. Credit Union*, No. 25-2207, 2025 WL 3765497, at *1–2 (9th Cir. Dec. 30, 2025) (finding a clickwrap agreement where a user was presented with a checkbox next to the words "I agree with" the terms and conditions, and a separate "Agree" button at the bottom of the page)[2]; *Houtchens v. Google LLC*, 649 F. Supp. 3d 933, 939 (N.D. Cal. 2023) (holding that the "agreement at issue" was a clickwrap, because a user was required to "affirmatively check a box that indicates, 'I agree to the . . . Terms of Service' . . . .") (quotations omitted).

### b. The Arbitration Agreement Most Closely Resembles a Sign-in Wrap Agreement

Defendant alternatively argues that its arbitration agreement qualifies as a valid sign-in wrap agreement. Mot. at 12–14. As opposed to a clickwrap or a browsewrap agreement, "a sign-

---

[2] As an unpublished Ninth Circuit decision, *Ortiz* is not precedent, but may be considered for its persuasive value. *See* Fed. R. App. P. 32.1; CTA9 Rule 36-3.

United States District Court
Northern District of California

in wrap lives somewhere in the middle: the website provides a link to terms of use and indicates that some action may bind the user but does not require that the user actually review those terms." *Chabolla v. ClassPass Inc.*, 129 F.4th 1147, 1154 (9th Cir. 2025). Instead of clicking an explicit "I agree" button, the user is "purportedly bound by clicking *some other* button that they would otherwise need to click to continue with their transaction . . . most frequently, a button that allows the consumer to 'sign in' or 'sign up' for an account." *Sellers*, 73 Cal. App. 5th at 471 (emphasis in original). Where a sign-in wrap agreement is concerned, "the existence of a contract" requires proper "inquiry notice of the terms at issue." *Id.* (citation and quotations omitted). Sign-in wrap agreements generally include explicit language informing the user that they are assenting to an agreement. *See Chabolla*, 129 F.4th at 1152, 1154 (finding that an agreement "most closely resembles a sign-in wrap agreement" where users were presented with explicit assent language including, "By clicking 'Sign up with Facebook' or 'Continue,' I agree to the Terms of Use and Privacy Policy") (quotations omitted); *see also Keebaugh*, 100 F.4th at 1010–11, 1014 (language informing users that "By tapping Play I agree to the Terms of Service," with the Terms of Service hyperlinked below, qualified as a sign-in wrap agreement).

The Court observes that there are some ways that Defendant's checkout screen fits the definition of a sign-in wrap agreement, and some ways it does not. As is required for a sign-in wrap agreement, Defendant's checkout screen "provides a link to terms of use . . . but does not require that the user actually review those terms." Lindell Decl. ¶ 7, Ex. C, at 19–20; *see Chabolla*, 129 F.4th at 1154. And as in *Sellers*, instead of an explicit "I agree" button, Defendant's checkout screen requires users to click "*some other* button that they would otherwise need to click to continue with their transaction": a mandatory checkbox next to the words "TERMS AND CONDITIONS." Lindell Decl. ¶ 7, Ex. C, at 19–20; *see* 73 Cal. App. 5th at 471. But unlike *Chabolla* and *Keebaugh*, where there was at least some language telling a user that *by taking* some action they would be agreeing to the website's terms, Defendant's checkout screen lacks this instructive language. *See* Lindell Decl. ¶ 7, Ex. C, at 19–20; *Chabolla*, 129 F.4th at 1152; *Keebaugh*, 100 F.4th at 1010–11. With only the text "TERMS AND CONDITIONS" next to the checkbox, Defendant's checkout screen never expressly "indicates that some action may

7

United States District Court
Northern District of California

bind the user" to Defendant's terms. *See Chabolla*, 129 F.4th at 1154.

Nonetheless, the Court finds that Defendant's arbitration agreement "most closely resembles a sign-in wrap agreement." *See Chabolla*, 129 F.4th at 1154 (citation omitted). Similar to the defendant in *Berman*, Defendant does not contend that Plaintiff "had actual knowledge of an agreement to arbitrate." *See* 30 F.4th at 856. The Court therefore follows the Ninth Circuit's direction that this agreement "may be an enforceable contract based on inquiry notice." *See Chabolla*, 129 F.4th at 1154 (citation omitted). To satisfy inquiry notice, Defendant's website must meet two elements: (1) it must provide "reasonably conspicuous notice of the terms to which the consumer will be bound"; and (2) it must require the user to "take[] some action, such as clicking a button or checking a box, that unambiguously manifests his or her assent to those terms." *Id.* at 1154–55 (citation and quotations omitted); *see also Oberstein*, 60 F.4th at 514 (finding that the Ninth Circuit applies this same inquiry notice test where an online agreement does not "fall neatly into either the clickwrap or browsewrap categories").

### c. MyPillow's Website Fails to Create an Unambiguous Manifestation of Assent

To meet the standard for unambiguous manifestation of assent, a website must meet two criteria. First, it must "explicitly advise[]" the user that some action "will constitute assent to the terms and conditions of an agreement." *Berman*, 30 F.4th at 857. "Even strongly implicit advisement isn't enough—a webpage must explain that certain actions will be understood by the offeror to signal assent to contractual terms." *Godun*, 135 F.4th at 711 (emphasis removed). Second, the website must also "identify what, exactly, those actions are." *Id.* "[A]n advisal that simply states that 'I understand and agree to the Terms and Conditions' but fails to indicate to the user what action would constitute assent is not enough to invite an unambiguous manifestation of assent." *Id.* at 713 (citation and quotations omitted). Websites should generally include "an explanatory clause . . . for example: '*By clicking* the Continue >> button, you agree to the Terms & Conditions,' or '*By tapping* Play I agree to the Terms of Service.'" *Id.* at 711 (emphasis in original) (citations and quotations omitted).

In *Godun*, the Ninth Circuit held that for some plaintiffs, JustAnswer's website failed to

require an unambiguous manifestation of assent to the arbitration agreement, because "[t]he advisal . . . failed to explicitly advise users of what action would constitute assent." *Id.* at 712. After entering their payment information, several of the plaintiffs were presented with a checkbox next to the words, "I agree to the Terms of Service, Privacy Policy . . . ." *Id.* at 705–06. The Ninth Circuit highlighted that "[t]he advisal lacked an explanatory phrase indicating that 'By clicking connect now' or 'By connecting,' or 'By chatting,' etc., [the user] agreed to the terms." *Id.* at 712. Instead, the advisal "simply said 'I agree' without explaining more." *Id.* at 713. This defect was fatal to the formation of an arbitration agreement: "[u]nder our precedent construing California law, that is not enough to constitute an unambiguous manifestation of assent to those terms." *Id.* (citations and quotations omitted).

By contrast, in *Oberstein*, the Ninth Circuit found that the plaintiffs did unambiguously manifest their assent, because they were "explicitly alert[ed]" that certain actions would constitute agreement to the website's terms. 60 F.4th at 517. When signing into their accounts on Live Nation Entertainment's website, the plaintiffs in *Oberstein* encountered an advisal stating, "By continuing past this page, you agree to the Terms of Use." *Id.* at 515 (quotations omitted). And when placing an order, users were advised that, "By continuing past this page and clicking 'Place Order,' you agree to our Terms of Use." *Id.* at 516 (quotations omitted). Because these advisals explicitly informed users that they were agreeing to the website's terms, and told users what actions would constitute agreement, the Ninth Circuit found that they were "straightforward" examples of unambiguous manifestations of assent. *Id.* at 517.

The Court finds that the arbitration agreement here fails to meet either requirement. First, Defendant's checkout screen lacks any language indicating that a user agrees to or accepts the website's terms and conditions. *See* Lindell Decl. ¶ 7, Ex. C, at 19–20. Defendant's checkout screen thus never "explicitly advise[s]" users that any action would constitute assent to the website's terms. *See Berman*, 30 F.4th at 857. Although there is a checkbox next to the words "TERMS AND CONDITIONS," the Ninth Circuit has made clear that even "strongly implicit advisement isn't enough," and that websites "must *explain* that certain actions will be understood

by the offeror to signal assent to contractual terms."[3] *See Godun*, 135 F.4th at 711 (emphasis in original). Without explicit language telling users that they are assenting to the terms and conditions, Defendant's checkout screen fails to create an unambiguous manifestation of assent.

Second, Defendant's checkout screen "lack[s] an explanatory phrase" telling users that by clicking the checkbox, they are assenting to the website's terms. *See Godun*, 135 F.4th at 712. Unlike in *Oberstein*, where the website contained explanatory phrases including "By continuing past this page" or "By clicking 'Place Order,'" Defendant's checkout screen provides no equivalent instructions. *See* 60 F.4th at 515–16 (quotations omitted). Because Defendant's checkout screen fails to "explicitly advise users of what action would constitute assent," users do not unambiguously manifest their assent to Defendant's terms and conditions. *See Godun*, 135 F.4th at 712.

Defendant argues that Plaintiff unambiguously manifested assent to the contract terms because the terms and conditions webpage explains that "by accessing or otherwise using the site [a user] agree[s] to these Terms & Conditions." Mot. at 13–14 (citing Lindell Decl., Ex. B). On the one hand, accepting Defendant's argument would effectively require enforcement of a browsewrap agreement—the kind where an "internet user accepts a website's terms of use merely by browsing the site"—which the Ninth Circuit has found to be "unenforceable, as individuals do not have inquiry notice." *See Keebaugh*, 100 F.4th at 1014. On the other hand, even continuing to analyze the agreement as a sign-in wrap does not help Defendant's argument here. In cases where the Ninth Circuit has found valid sign-in wrap agreements, the advisals at issue have routinely been in close proximity to the buttons that users have to press. *See, e.g., Oberstein*, 60 F.4th at 517 (finding unambiguous manifestation of assent where advisals were "directly on top of or below each action button"); *Keebaugh*, 100 F.4th at 1010–11 (upholding sign-in wrap agreement where advisals were directly beneath the "Play" button that users would press to accept the terms

---

[3] For similar reasons, Defendant's argument that Plaintiff does not provide "evidence that she was confused by the checkbox" is unavailing. Reply at 2. Defendant, not Plaintiff, bears the burden to "show notice and assent," and it is Defendant's website that "must *explain*" explicitly what the checkbox means, instead of placing the burden on Plaintiff to figure it out herself. *Jackson v. Amazon.com, Inc.*, 65 F.4th 1093, 1100 (9th Cir. 2023); *Godun*, 135 F.4th at 711 (emphasis in original).

10

and conditions); *Patrick v. Running Warehouse, LLC*, 93 F.4th 468, 474 (9th Cir. 2024) (upholding sign-in wrap agreement where advisals telling users that submitting an order would bind users to terms and conditions were located "[i]mmediately adjacent to this final button"). By contrast, here the advisal is not located anywhere on Defendant's checkout page. Instead, users must click a hyperlink to access a separate, nine-page document to learn that simply browsing the website will bind them to its terms. Lindell Decl., ¶¶ 3–7, Ex. B. The Ninth Circuit's unambiguous manifestation of assent standard does not require users to research whether they are bound to contracts: it requires websites to "explicitly advise[]" users of the import of their actions. *See Berman*, 30 F.4th at 857. Defendant has not shown that it did so here.

Finally, Defendant argues that this case is distinguishable from *Berman*, *Chabolla*, and *Sellers*, because "assent here is determined by the context of the transaction." Reply at 3–4. This is exactly the argument that the Ninth Circuit rejected in *Godun*. By arguing that context should resolve whether there is an unambiguous manifestation of assent, Defendant "misunderstands the nature of the test and crosses doctrinal wires." *See Godun*, 135 F.4th at 713. In determining whether there is an unambiguous manifestation of assent, courts should "not look to the context of the transaction," and should instead rely on the "explicit advisement of what actions will be taken to signify assent." *Id.* Because Defendant made no such explicit advisement, the Court finds that there was no unambiguous manifestation of assent.[4] Accordingly, the Court finds that the parties did not form an agreement to arbitrate.

## IV.    CONCLUSION

The Court **DENIES** Defendant's motion to compel arbitration. Dkt. No. 16. Defendant is **DIRECTED** to file an answer within 21 days of this order. The Court further **SETS** a case management conference on July 28, 2026 at 2:00 p.m. The hearing will be held by Public Zoom Webinar. All counsel, members of the public, and media may access the webinar information at https://www.cand.uscourts.gov/hsg. All attorneys and pro se litigants appearing for the case

---

[4] Because the Court finds that Defendant has not met its burden to show Plaintiff unambiguously manifested her assent to the arbitration agreement, the Court need not consider whether Defendant's website met the standard for "reasonable conspicuousness." *See Godun*, 135 F.4th at 712.

management conference are required to join at least 15 minutes before the hearing to check in with the courtroom deputy and test internet, video, and audio capabilities.  The parties are further **DIRECTED** to file a joint case management statement by July 21, 2026.

   **IT IS SO ORDERED.**

Dated:   June 18, 2026

_____
HAYWOOD S. GILLIAM, JR.
United States District Judge

United States District Court
Northern District of California